JUSTHEIM PETROLEUM COMPANY,
Plaintiff/Appellant,

v.

The DEPARTMENT OF The INTERIOR,
et al., Defendants/Appellees.

No. 83–2214.

United States Court of Appeals,
Tenth Circuit.

Aug. 7, 1985.

Harold A. Hintze of Fox, Edwards & Gardiner, Salt Lake City, Utah, for plaintiff/appellant.

J. Carol Williams, Washington, D.C. (F. Henry Habicht, II, Asst. Atty. Gen., Washington, D.C., Brent D. Ward, U.S. Atty. and Joseph W. Anderson, Asst. U.S. Atty., Salt Lake City, Utah, and Anne S. Almy, Dept. of Justice, Washington, D.C., with her on the Brief), for defendants/appellees.

Before BARRETT, MOORE, and TIMBERS *, Circuit Judges.

---

* The Honorable William H. Timbers, Senior Circuit Judge for the Second Circuit, sitting by designation.

BARRETT, Circuit Judge.

Justheim Petroleum Company (Justheim) appeals from the district court's grant of summary judgment in favor of the Department of Interior (Interior). The district court agreed with the Interior Board of Land Appeals (IBLA) that Justheim did not have a vested right to the issuance of leases covering certain federal lands in Utah, and that the Bureau of Land Management's (BLM) rejection of Justheim's lease applications was therefore not an abuse of discretion. The facts are not in dispute.

On June 10, 1974, Justheim filed lease applications with the Utah office of the BLM. At that time, the lands covered by these applications were not within any known geologic structure. Leases could therefore be issued for these lands pursuant to 30 U.S.C. § 226(c) without competitive bidding to the first qualified applicant.

Although Justheim was the first qualified applicant for the leases at issue, the BLM notified Justheim that its applications would be held in abeyance for one year pending resolution of an action by the State of Utah against the Secretary of Interior (Secretary) in which the State sought title to the same lands. The decision further stated that if the action between the State and the Secretary had not been resolved within one year, then the BLM would reject Justheim's lease offers.

Justheim appealed this decision to the IBLA. On February 13, 1975, the IBLA rendered a decision reversing the BLM, holding that "the suspension of the offers for a maximum of one year from the date of the decision below regardless of whether the state selection applications have been ... judicially resolved is not sound." *Justheim Petroleum Co.*, 18 IBLA 423, 424 (1975). As a result of this decision, Justheim's lease applications were held in abeyance "until such time as the state selection applications [were] judicially resolved." *Id.*

Thereafter, however, and prior to resolution of the action by the State against the Secretary, the Acting Utah State Director of the BLM expressed the position of the BLM that it would be in the public interest to lease certain lands, including those covered by the applications at issue here, if the State would consent to such. The State refused to consent to the issuance of any such leases, and none were issued.

On May 19, 1980, the dispute between the State and the Secretary was resolved in *Andrus v. Utah*, 446 U.S. 500, 100 S.Ct. 1803, 64 L.Ed.2d 458 (1980). There the Court held that the State of Utah did not have the right to select lands covered by Justheim's applications. What ostensibly was the final impediment to the issuance of leases to Justheim was thus removed. On August 26, 1980, however, Under Secretary James Joseph issued a directive which imposed a moratorium upon the further issuance of leases to certain lands in the State, identified as designated tar sands areas, which included those lands covered by the applications at issue here. "The purpose of the directive was to not issue additional oil and gas leases in the area prior to passage of legislation enabling the Bureau to issue combined hydrocarbon leases for both oil and gas and tar sands or prior to the inception of a Bureau tar sands leasing program...." R.Vol. I at 60.

On May 28, 1981, the Secretary qualified the August 26, 1980, directive by directing the Utah BLM office to issue leases for those applications made prior to the August 26, 1980, moratorium:

We continue to remain interest [sic] in preserving the opportunity to issue tar sand leases without encumbering oil and gas leases in the same acreage. *Even so, there are a small number of oil and gas lease applicants whose offers were submitted prior to August 26, 1980, but whose leases have not been issued because of the Under Secretary's directive. In the interests of equity, please direct the Utah State Office to proceed with the issuance of oil and gas leases in DTSA's applied for prior to August 26, 1980.* Disposition of the applications received on or after that date will await further policy review. (Emphasis added).

A copy of this directive was placed in Justheim's file at the Utah BLM office, and, based upon this directive, Justheim expended substantial sums of money in exploratory drilling on the subject leases, apparently having been granted a permit by the BLM to do so. It is upon this directive that Justheim claims it had a "vested right" to the issuance of leases for lands covered by its lease applications.

For reasons which do not appear in the record of this appeal, the Utah BLM office did not immediately issue leases to qualified applicants who had filed lease applications prior to August 26, 1980. In the meantime, Congress passed the Combined Hydrocarbon Leasing Act (the Act), which, among other things, amended 30 U.S.C. § 226(c) to require that lands within DTSA's be leased only by competitive bidding. The Act had an effective date of November 16, 1981.

On March 5, 1982, the BLM rejected Justheim's lease applications for the reason that the lands covered by the lease applications, following passage of the Act, were no longer subject to noncompetitive leasing. This decision was upheld by the IBLA. *Justheim Petroleum Co.*, 67 IBLA 38 (1982). Justheim then filed a petition for review of the administrative decision in the district court, where the case was submitted upon cross-motions for summary judgment. Following the district court's grant of summary judgment in favor of Interior, the present appeal was taken.

### Discussion

■ Under the Mineral Leasing Act of 1920, 30 U.S.C. § 181 *et seq.*, 41 Stat. 437 (1958), the Secretary has broad "discretion to refuse to issue any lease at all on a given tract." *Udall v. Tallman*, 380 U.S. 1, 4, 85 S.Ct. 792, 795, 13 L.Ed.2d 616 (1965). The mere application for a lease thus vests no rights in the applicant, *Haley v. Seaton*, 281 F.2d 620, (D.C.Cir.1960), except the right to have the application fairly considered under the applicable statutory criteria. *Schraier v. Hickel*, 419 F.2d 663, 667 (D.C.Cir.1969). This result obtains both when the applicant is the first qualified applicant and when the applicant files in response to a government notice that it will receive offers. *Id.; Arnold v. Morton*, 529 F.2d 1101, 1106 (9th Cir.1976). In addition, the Secretary is under no requirement to issue or reject lease applications within a certain time limit. *Angelina Holly Corp. v. Clark*, 587 F.Supp. 1152, 1156 (D.C. 1984); *Rowe v. United States*, 464 F.Supp. 1060, 1070 (D.Alaska 1979), *aff'd in relevant part*, 633 F.2d 799 (9th Cir.1980), *cert. denied*, 451 U.S. 970, 101 S.Ct. 2047, 68 L.Ed.2d 349 (1981).

Justheim does not dispute these general legal principles, but instead takes issue with Interior's argument that rights do not "vest" until a lease is signed by the authorized officer. Justheim recognizes that, under the federal regulations, a lease "issues" when signed by "the authorized officer." 43 C.F.R. 3112.6–2. Justheim argues, however, that rights to a lease can vest prior to the time the lease is actually signed when, as here, the Secretary specifically exercises his discretion and directs a local BLM office to issue leases. Justheim relies on *Southwestern Petroleum v. Udall*, 361 F.2d 650, 655 (10th Cir.1966), as authority for this argument.

In *Southwestern Petroleum*, the initial question before this Court was whether the bona fide purchaser amendments to the Mineral Leasing Act could retroactively protect the assignee of a lessee as against a second lessee to the same tract. The material facts, in chronological order, were as follows: (1) the BLM issued a lease to the first applicant, whose lease application did not comply with the statutory prerequisites and thus was subject to cancellation; (2) the first lease applicant assigned his lease to a bona fide purchaser; (3) the BLM issued a lease to the same tract to a second applicant; (4) Congress passed the amendments protecting bona fide purchasers of lease rights; (5) upon becoming aware that it had issued two leases to the same tract, the BLM canceled the second applicant's lease in its entirety; (6) the BLM canceled the first applicant's lease for noncompli-

ance with statutory criteria; (7) the decision canceling the second applicant's lease in its entirety was modified to leave the lease application in effect; and (8) the assignment from the first lessee to the bona fide purchaser was approved by the BLM and the lease application of the second lessee was rejected.

After first concluding that the bona fide purchaser amendments could be retroactively applied to give the assignee protection under the Act, we next considered the effect of that protection upon the second lessee, concluding that:

> The right of Southwestern as against the Secretary to require the issuance of a lease to it came into being after the critical time. It was not then a "vested right," not a present legal or equitable "title," "interest" or "ownership" or "perfected right" at such time to come within the protection of the Fifth Amendment. It was a right to a right originating in the Mineral Leasing Act, later to become enforceable against the Secretary by reason of the Act and the decisions above referred to. It had not matured at the time Lowe's rights attached to such a point that it was vested as to be protected by the Fifth Amendment.

361 F.2d at 655. Implicit in this language, argues Justheim, is the conclusion that the second lessee's rights would have vested had the first lessee's lease been ruled invalid prior to Congress' passage of the bona fide purchaser amendments. If this is true, the argument continues, then the lease should issue here to Justheim because its status would thus be indistinguishable from that of the second lessee. That is, if there had been no bona fide purchaser amendments, then the first lease would have been cancelled—a nullity. The second lessee would then be entitled to a lease, even though technically the first lease had never issued.

■ We agree with Justheim's argument insofar as it relies on *Southwestern Petroleum* as implying that the lease would have issued there to the second qualified applicant if the first lease had been canceled prior to Congress' passage of the bona fide purchaser amendments. However, we must disagree with its further conclusion that it follows that leases should issue in this case. The general rule, which was clearly set out at the beginning of our discussion in *Southwestern Petroleum*, is that "the Secretary [has] the discretion to offer lands for lease, but once he has decided to lease it is mandatory that he issue a lease to the first qualified applicant, *if he is going to lease at all*." 361 F.2d at 654 (emphasis added). The implication upon which Justheim places so much reliance is entirely consistent with this general rule. Inasmuch as the Secretary has the discretion to lease or not to lease, the "critical time" frame we referred to in *Southwestern Petroleum* is *after* a lease has actually issued. Until that time, even if, as here, the Secretary specifically directs an office to issue leases, a lease applicant has only a hope or expectation, rather than any vested right, to the issuance of a lease. *Schraier,* 419 F.2d at 668.

■ Consequently, even though the Secretary exercised his discretion in this case and directed the Utah BLM office to proceed with the issuance of leases, if Interior's legal authority to issue noncompetitive leases were withdrawn before the Utah BLM office acted on the lease applications, then any leases awarded to Justheim would be subject to cancellation. *See Daniel A. Engelhardt* (On Reconsideration), 62 IBLA 93, 97 (1982) ("[B]eyond the question of Secretarial discretion, ultimate control of the disposition of public lands and resources belongs to Congress, and the responsibility of [Interior] is to administer them in accordance with the dictates of the legislative branch"). This is precisely what occurred in this case. Before the BLM acted on Justheim's applications, Congress changed the status of the lands in question from noncompetitive to competitive bidding. That the BLM did not act immediately following the Secretary's directive on Justheim's leases does not mean that it acted contrary to law. *Angelina Holly; Rowe; Miller v. Udall,* 317 F.2d 573 (D.C.

Cir.1963) (the court favorably referred to an opinion of a Deputy Solicitor of the Department of the Interior that until the United States accepts an offer (application) to lease, the filing of the offer, in itself, is not a binding agreement to lease); *McDade v. Morton,* 353 F.Supp. 1006 (D.C.D.C. 1973), *affirmed,* 494 F.2d 1156 (D.C.Cir. 1974) (the court favorably cited to 43 C.F.R. 3111.1–1(c), formerly 43 C.F.R. 3123.5(b), 29 F.R. 4511 (1964) for the rule that the United States indicates its acceptance of a lease offer by issuance of the lease with the signature of the appropriate officer affixed thereto and that no other manner has been provided, or recognized by any court, for the United States to indicate its acceptance of an oil and gas lease offer).

The status of the lands was changed prior to any action by the BLM on Justheim's lease applications. Thus, the BLM properly rejected Justheim's lease application.

We Affirm.