PUBLIC COPY - SENSITIVE SECURITY INFORMATION DELETED

# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 11, 2011      Decided December 6, 2011

No. 10-1418

AMERICAN AIRLINES, INC.,
PETITIONER

v.

TRANSPORTATION SECURITY ADMINISTRATION AND JOHN S.
PISTOLE, IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF
THE TRANSPORTATION SECURITY ADMINISTRATION,
RESPONDENTS

———

On Petition for Review of a Decision of
the Transportation Security Administration

———

*Lawrence D. Rosenberg* argued the cause for petitioner.
With him on the briefs were *Andrew B. Steinberg* and
*Christopher S. Perry.*

*Lindsey Powell,* Attorney, U.S. Department of Justice,
argued the cause for respondents. With her on the brief were
*Tony West,* Assistant Attorney General, *Ronald C. Machen Jr.,*
U.S. Attorney, and *Douglas N. Letter,* Attorney.

PUBLIC COPY - SENSITIVE SECURITY INFORMATION DELETED

Before: SENTELLE, *Chief Judge*, GINSBURG[1], *Circuit Judge*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Chief Judge* SENTELLE.

SENTELLE, *Chief Judge*:[2]  In 2002, American Airlines ("American") agreed, at the urging of the Transportation Security Administration ("TSA"), to incorporate an "in-line" baggage-screening system into its new terminal at John F. Kennedy International Airport, instead of a cheaper system in which luggage would be screened in the lobby of the airport. According to American, the airline only undertook the more expensive project at TSA's insistence and with the promise that the agency would reimburse the airline once Congress gave TSA the authority to grant such requests. After Congress granted that authority and after American's expenditures on the screening system totaled nearly $30 million, the airline requested reimbursement from TSA. The agency denied that request, citing limited funding and a need to prioritize ongoing security risks ahead of completed projects. American petitions for review of that denial, arguing that TSA failed to comply with Congress's requirements for the agency's reimbursement determinations. Because TSA either has failed to base its reimbursement decision on the prioritization list mandated in 49 U.S.C. § 44923 or has failed to create a suitable prioritization list in the first place, we grant the petition and remand to TSA

---

[1] As of the date the opinion was published Judge Ginsburg had taken senior status.

[2] **NOTE**: Portions of this opinion contain **Sensitive Security Information**, which has been redacted. The redactions are indicated by ╠ and ╣ symbols.

3

**PUBLIC COPY - SENSITIVE SECURITY INFORMATION DELETED**

for further proceedings.

## I. Background

After the September 11, 2001, attacks, Congress enacted a series of laws to protect and enhance airline security. First among these was the Aviation and Transportation Security Act ("ATSA"), Pub. L. No. 107-71, 115 Stat. 597, 614-15 (2001). With the ATSA, Congress created the TSA and charged the agency with ensuring that by the end of 2002 all passengers and materials carried onboard passenger aircraft would be screened for explosives. 49 U.S.C. § 44901(a), (d).

At the time of the enactment of the ATSA, construction had begun on "Terminal 8" at New York's John F. Kennedy International Airport. As sole tenant of the new terminal, American took the lead in the project, which involved the Port Authority of New York and New Jersey as the operator of the airport and, eventually, TSA as well. After the attacks, the new TSA urged that Terminal 8 be built to include an "in-line" system for its explosive detection system ("EDS"). An in-line system checks bags for explosives within the airport's baggage conveyor system, thus avoiding the need for TSA baggage screeners to physically transport bags to and from the EDS machine. This makes screening cheaper—particularly for TSA—yet it scans baggage at a higher rate than alternative methods. American, on the other hand, preferred the simpler "lobby screening solution," in which bags are screened in the airport lobby at standalone EDS stations and then transported by TSA employees to the baggage conveyor system. The lobby system would be far cheaper and quicker to implement, and it would not require alterations to the terminal building itself. During TSA's attempts to persuade American to use the more expensive system, the only statute then in effect, the ATSA, did

PUBLIC COPY - SENSITIVE SECURITY INFORMATION DELETED

not address funding for in-line security systems. American claims, however, that TSA assured the airline that once procedures for reimbursement were in place and Congress had given authority to do so, Terminal 8 would receive favorable and expedited consideration. American agreed to alter the design for Terminal 8 to utilize an in-line screening system, as TSA requested. The parties did not sign an agreement or memorandum of understanding.

In 2003, Congress granted TSA the authority to make grants for projects that "improve security at an airport or improve the efficiency of the airport without lessening security," including projects related to the installation of in-line explosive detection systems. Vision 100—Century of Aviation Reauthorization Act, Pub. L. No. 108-176, 117 Stat. 2490, 2566 (2003). Under that act, airport sponsors seeking funding apply to TSA, and, if approved, receive a "letter of intent" which commits TSA to use future budget authority to assist in funding the project. In 2004, Congress enacted a statute which urged TSA to move faster with the installation of in-line baggage screening and to undertake a study to develop a "formula for cost-sharing" among government and private entities for in-line baggage screening projects. Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, 118 Stat. 3638, 3721–22.

Around that time, American began requesting reimbursement from TSA for the in-line screening system in Terminal 8. In 2004, American wrote to Admiral David Stone, then-Acting TSA Administrator, noting that the airline had taken on the additional expense of the in-line screening system with the expectation of full reimbursement. Admiral Stone responded, applauding American's leadership in deploying the in-line system but declining to reimburse American at that time

**PUBLIC COPY - SENSITIVE SECURITY INFORMATION DELETED**

because "TSA's work to achieve and maintain full electronic screening at a number of airports [was] not yet complete." Discussions continued between American, TSA, and Port Authority officials, including a 2005 meeting with Congressman Gregory W. Meeks of New York. The Congressman has stated that TSA "made [it] very clear" that American would be reimbursed for the Terminal 8 project.

In 2007, Congress amended the previous airport security acts with the Implementing Recommendations of the 9/11 Commission Act of 2007 ("2007 Act"), Pub. L. No. 110-53, 121 Stat. 266, 480. There, Congress amended the provisions that are chiefly at issue in this case. The amended subsections read:

**Grant authority.**—Subject to the requirements of this section, the Under Secretary for Border and Transportation Security of the Department of Homeland Security shall make grants to airport sponsors—

**(1)** for projects to replace baggage conveyer systems related to aviation security;

**(2)** for projects to reconfigure terminal baggage areas as needed to install explosive detection systems;

**(3)** for projects to enable the Under Secretary to deploy explosive detection systems behind the ticket counter, in the baggage sorting area, or in line with the baggage handling system; and

**(4)** for other airport security capital improvement projects.

49 U.S.C. § 44923(a). Conspicuously, the amendments changed

the words "may make" to "shall make." The 2007 Act also amended the notes to that section to require TSA to create a "prioritization schedule for airport security improvement projects," which "shall include airports that have incurred eligible costs associated with development of partial or completed in-line baggage systems before the date of enactment of this Act in reasonable anticipation of receiving a grant." *Id.* § 44923 note.

American continued to remind TSA of the airline's up-front investment in the in-line screening project, stating in a February 2008 letter that the airline "only proceeded with the investment because [American] had the reasonable expectation of federal reimbursement in the future." A few months later, TSA issued a $400 million grant to the Port Authority so that it could implement in-line baggage screening improvements at the several airports it administers. That grant, TSA later determined, could not by its terms be used to reimburse American's expenses, notwithstanding the Port Authority's willingness to do so.

In January 2010, American wrote to Janet Napolitano, Secretary of Homeland Security, requesting reimbursement and noting the Port Authority's willingness to use a portion of its $400 million grant to do so. Acting TSA Administrator Gale Rossides replied in March 2010, again noting TSA's view that the statute's mandate of risk-based prioritization required it to fund new projects before reimbursing old ones and again stating that the $400 million grant to the Port Authority could not be used to reimburse American.

Finally, on August 20, 2010, American and the Port Authority wrote TSA directly to request a meeting with the new TSA Administrator, John Pistole. Administrator Pistole

PUBLIC COPY - SENSITIVE SECURITY INFORMATION DELETED

responded on October 25, 2010, declining the meeting and stating that he had come to the "difficult decision" that "reimbursement for previous work outside a formal agreement comes at the cost of advancing current or future security measures." American requested reconsideration in a letter dated December 9, 2010, and noted in that letter that the airline would seek judicial review if it did not receive appropriate relief by December 22, 2010. Having received no response by that date, American filed this petition. On the same day, Administrator Pistole sent a letter to American denying reconsideration.

## II. Finality and Timeliness

American characterizes the October 25, 2010, letter as the final agency decision and the airline's December 9, 2010, letter to the TSA as a request for reconsideration. TSA disagrees, contending that the October 2010 letter was no different than the many rejections the agency had sent to American prior to that date and that the March 2010 letter to American is better understood as the final agency action. Therefore, TSA asserts, American's petition for review is untimely because the petition was not filed with this Court within sixty days of that action, as required by 49 U.S.C. § 46110(a). We disagree. The October 25, 2010, letter is the only agency communication bearing sufficient indicia of finality to make clear to American that a final decision had in fact been made, and this petition was filed within sixty days of the October 2010 letter.

A final agency action is one that "mark[s] the consummation of the agency's decisionmaking process," and is one "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear,* 520 U.S. 154, 177–78 (1997) (internal citations and quotation

8

**PUBLIC COPY - SENSITIVE SECURITY INFORMATION DELETED**

marks omitted). The agency action must state an "unequivocal position," *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 436 (D.C. Cir. 1986), rather than one which is contingent on future agency actions, *see AT&T Co. v. EEOC*, 270 F.3d 973, 975 (D.C. Cir. 2001). If we considered agency statements lacking clear indicia of finality to nonetheless be final agency action, subjects of agency regulation would be forced to file repeated precautionary petitions for review. Such petitions would waste the time and resources of the Court and of the parties, and would promote unfairness by allowing an agency to retroactively determine whether a particular statement was final or not. Considerations such as these have long been an integral part of finality determinations. *See, e.g., Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967) ("The cases dealing with judicial review of administrative actions have interpreted the 'finality' element in a pragmatic way."); *see also* 15A Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 3913 (2d ed.) ("[W]ell-established rules of appealability . . . have nonetheless the great virtue of forestalling the delay, harassment, expense, and duplication that could result from multiple or ill-timed appeals.").

Applying this reasoning, we compare the two letters in question, looking for statements attesting to an unequivocal decision made by the agency that is not contingent on future agency actions. Comparison of the March 2010 communication from Acting TSA Administrator Rossides with the October 2010 letter from TSA Administrator Pistole reveals that the October 2010 letter is the only TSA communication bearing sufficient indicia of finality to constitute final agency action. The October 2010 letter states that the Administrator had "concluded" and had made a "decision" denying American's reimbursement request. The March 2010 letter, on the other hand, uses no such clear language and instead merely describes the general

**PUBLIC COPY - SENSITIVE SECURITY INFORMATION DELETED**

risk-assessment policy. That letter even notes TSA's desire to "foster a close working relationship . . . *on this* and other homeland security issues" (emphasis added). Furthermore, in the October 2010 letter, Administrator Pistole notes, without mentioning the March 2010 letter, that he "personally reviewed the documentation" related to the project—a review that would be redundant if a final decision had been reached in March 2010. The March 2010 letter was general and tentative. The October 2010 letter was specific and unequivocal in denying the reimbursement.

Indeed, TSA's December 22, 2010, letter denying reconsideration belies TSA's timeliness argument. That letter expressly thanks American for "requesting reconsideration of the October 29, 2010[,] *decision* denying reimbursement" (emphasis added). It seems that only during this litigation did TSA decide that it had actually reached a final decision in March 2010. An agency's post-hoc and self-serving determination that an earlier statement was final cannot override textual evidence to the contrary. *Cf. Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962) ("The courts may not accept appellate counsel's post hoc rationalizations for agency action . . . ."). We find that the final agency action in this controversy is the October 25, 2010, letter from TSA denying American's request for reimbursement. American's filing of this petition on December 22, 2010, was therefore timely.[3]

---

[3] TSA alludes in its brief to the possibility that some communication prior to March 2010 may, in fact, have been the final agency action, but that we need not look beyond the March 2010 letter to judge the timeliness of the petition. Because the agency does not specifically identify and explain the earlier communication or communications it purports to be final, we need only address TSA's

PUBLIC COPY - SENSITIVE SECURITY INFORMATION DELETED

### III. TSA's Denial of Reimbursement

As amended by the 2007 Act, the statute states that TSA "shall make grants to airport sponsors" for qualifying airport security projects. 49 U.S.C. § 44923(a). The statute also requires that TSA "shall establish a prioritization schedule for airport security improvement projects" and must base that prioritization schedule on "risk and other relevant factors." 49 U.S.C. § 44923 note. That prioritization list "shall include airports that have incurred eligible costs associated with development of partial or completed in-line baggage systems before the date of enactment" of the statute, "in reasonable anticipation of receiving a grant." *Id.* At issue is whether TSA has properly exercised discretion under the statute in denying American's reimbursement request and whether TSA has properly created and followed the prioritization list required by the 2007 Act.

### A.

American contends, above all, that TSA's denial of reimbursement stands in direct conflict with the command in the 2007 Act that TSA "shall make grants" to airport sponsors of qualifying projects, including those who have already completed their projects. *See* 49 U.S.C. § 44923(a). Because TSA's actions are contrary to the plain meaning of the 2007 Act, American urges, TSA's decision is not entitled to deference.

---

claim regarding the finality of the March 2010 letter. At any rate, we note, as does Petitioner, that TSA's casual statement that the decision could actually have become final at some unspecified point in the past only highlights the absence of clear, firm statements prior to the October 2010 letter.

11

The statute's language, American suggests, contains repeated mandates that TSA must provide reimbursement for qualified projects, and American's project, completed with reasonable expectation of reimbursement, qualifies.

Next, American argues that even if TSA has discretion in awarding funding to qualified projects, it has abused that discretion. First, American argues that the 2007 Act requires TSA to prioritize reimbursement requests for completed in-line projects, such as Terminal 8, and TSA failed in its communications to "examine the relevant data and articulate a satisfactory explanation" for departing from that statutory command. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Further, American argues that the agency's limited-funding rationale is both factually inaccurate and legally unconvincing.

TSA responds to these arguments by noting that the "prioritization" requirement in the 2007 Act logically must be understood to mean that some projects would be reimbursed while others would not—otherwise, there would be no need to prioritize at all. Congress, knowing that, intended that TSA would have the discretion to make funding determinations based on "risk and other relevant factors," as specified in the 2007 Act. 49 U.S.C. § 44923 note. TSA asserts in its brief that the agency included the Terminal 8 project on the prioritization list it submitted to Congress and that its decision to prioritize funding for unresolved security risks over resolved risks like that at Terminal 8 is both rational and consistent with the agency's

12

**PUBLIC COPY - SENSITIVE SECURITY INFORMATION DELETED**

intended discretion under the 2007 Act.

## B.

We review TSA's decision under familiar standards. When Congress delegates to an agency the authority to interpret and apply a statute, appellate courts review the agency's actions under the two-step process from *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). If "the intent of Congress is clear, that is the end of the matter," and the Court will apply the statute accordingly. *Id.* at 842. But if a statute is unclear on the point in question, the Court will defer to the agency's reasonable interpretation. *Id.* at 843–44. Nonetheless, "a regulation contrary to a statute is void." *Orion Reserves Ltd. P'ship v. Salazar*, 553 F.3d 697, 703 (D.C. Cir. 2009) (citing *Manhattan Gen. Equip. Co. v. Comm'r of Internal Revenue*, 297 U.S. 129, 134 (1936)). The 2007 Act gives TSA both the authority and the mandate to create a prioritization list. 49 U.S.C. § 44923 note. That said, we will not set aside the agency's policy determinations in doing so unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Despite the deference owed to TSA's policy determinations, the agency decision before us cannot survive judicial scrutiny because the agency either has not made a prioritization schedule as required by 49 U.S.C. § 44923 note, or, if the schedule TSA has provided to the Court is the schedule mandated by statute, the agency has acted arbitrarily and capriciously in deviating from that schedule by denying American's reimbursement request without providing a sufficient rationale on the record for doing so. Regardless of which is the case, we vacate the decision to deny reimbursement to American and remand to the agency to conduct further

13

proceedings.

Congress's explicit mandate that TSA develop a prioritization list for reimbursing airport security projects carries with it the implication that the agency will actually follow that prioritization list in making its reimbursement decisions. Otherwise, the mandate of the 2007 Act that TSA create such a prioritization list becomes a meaningless exercise. *See Inhabitants of the Twp. of Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883) ("It is the duty of the court to give effect, if possible, to every clause and word of a statute . . . ."); *see also United States v. Seals*, 130 F.3d 451, 462 (D.C. Cir. 1997). At the same time, we agree with TSA that Congress's intent in requiring the agency to prioritize projects logically compels the understanding that some projects will be currently funded while others will not. Otherwise, there would be little need to prioritize funding at all. With that in mind, we must reject any suggestion that the 2007 Act must be read—or could even reasonably be read—to absolutely require reimbursement for any and all qualified projects.

TSA's discretion under the 2007 Act is not, however, unlimited. By the plain terms of the statute, TSA must create a prioritization list and must base the prioritization on "risk and other relevant factors." 49 U.S.C. § 44923 note. The list must include completed projects undertaken with reasonable expectation of reimbursement. *Id.* And while there could be cases in which the agency finds that it must deviate from its general prioritization, the agency must "adequately define the circumstances that 'trigger' the case-by-case analysis," and the agency must promulgate an "identifiable standard" to guide those determinations. *Oceana, Inc. v. Locke*, No. 10-5299, 2011 WL 2802989, at *3 (D.C. Cir. July 19, 2011). TSA has not done so. Rather, TSA has stated the prioritization list it created is

14

merely a "top-down" "initial guide," and it has expressly reserved the discretion to depart from the list on a case-by-case basis using a different, "bottom-up" methodology when making actual funding decisions. Like the provision at issue in *Oceana, Inc.*, TSA cannot make an exception to the prioritization list so vague or large "as to make the rule meaningless," *id.*, nor can TSA promulgate a prioritization list and then act contrary to it based on previously unannounced factors. Ultimately, TSA's decision here must be vacated either because the agency improperly deviated from its provided prioritization list or because the agency has failed to make a prioritization list that would comport with the mandates of the 2007 Act.



███████████████████████████████████████

██ If TSA purports to consider the prioritization list merely a starting point for making funding determinations based on other criteria, it has failed to sufficiently establish and follow criteria for departing from its general rule, thus rendering its prioritization list inadequate. *See Oceana, Inc.*, 2011 WL 2802989, at *3. If instead we consider the ██████████ prioritization list provided to the Court to be the bona fide, complete prioritization list already accounting for "risk and other relevant factors" mandated by the 2007 Act, 49 U.S.C. § 44923 note, then TSA simply failed to abide by it in making this decision and thus is acting contrary to the statute. *See* 5 U.S.C. § 706(2)(A). In either case, the agency's actions here must be vacated, and the issues remanded to the agency for further action or explanation.

## IV. Conclusion

For the reasons set forth above, we vacate TSA's decision to deny reimbursement to American for the Terminal 8 project and remand to TSA for further proceedings consistent with this opinion.

*So ordered.*