TYMKOVICH, Circuit Judge,
dissenting.
The per curiam opinion allows the Secretary of the Interior to make a non-public final decision and start the clock on judicial review of that decision, even if the Department tells no one about it. This result cannot be what Congress intended when it subjected decisions of the Secretary under the Mineral Leasing Act (MLA) to a ninety-day judicial review period.
I agree with Judge Seymour that final agency action commences the applicable limitations period. But I disagree with both of my colleagues that the Secretary’s undisclosed internal memorandum meets the test of finality. Therefore I respectfully dissent.
I.
First, a little background. In the early days of federal oil and gas prospecting, the Secretary of the Interior had wide discretion to grant or deny prospecting permits free from any judicial oversight. See United States ex rel. McLennan v. Wilbur, 283 U.S. 414, 419, 51 S.Ct. 502, 75 L.Ed. 1148 (1931). Congress reaffirmed the Secretary’s discretion in 1935, when it switched the prospecting system to a leasing system. See Haley v. Seaton, 281 F.2d 620, 624 (D.C.Cir.1960).
In 1946, however, Congress, with the passage of the Administrative Procedure Act (APA), authorized judicial oversight of the Secretary’s decisions. The default six-year statute of limitations for claims against the United States applied to leasing disputes with the Department of the Interior. See 28 U.S.C. § 41(20) (1940). In 1960, responding to complaints about excessive delay in leasing decisions and to “remove a potential cloud on acreage subject to leasing,” S. Rep. 86-1549 at 3317 (June 10, 1960), Congress determined that the period for challenging a leasing deci *1260 sion should be limited to ninety days: “No action contesting a decision of the Secretary involving any oil and gas lease shall be maintained unless such action is commenced or taken within ninety days after the final decision of the Secretary relating to such matter.” 30 U.S.C. § 226-2 (emphasis added).
II.
Our task here is twofold: first to interpret the meaning of the statutory phrase, “final decision of the Secretary,” and then to determine when, in this case, a final decision actually occurred. In my view, Judge Lucero’s concurrence gives undue emphasis to the word “decision” while ignoring its equally-significant modifier, “final.” I agree with Judge Seymour’s concurrence that, for a decision to be “final,” it must satisfy certain hallmarks of finality that are well-established in our precedents. But those hallmarks were not present until the Secretary’s decision was issued to the affected parties on February 12, 2009.

A. Principles of Construction

In interpreting a statute of limitations, we apply a strong presumption that the statutory period begins to run at the same time the affected party’s cause of action accrues. “Congress legislates against the ‘standard rule that the limitations period commences when the plaintiff has a complete and present cause of action.’ ” Graham, Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson, 545 U.S. 409, 418, 125 S.Ct. 2444, 162 L.Ed.2d 390 (2005) (quoting Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Fer-bar Corp. of Cal., Inc., 522 U.S. 192, 201, 118 S.Ct. 542, 139 L.Ed.2d 553 (1997)). Thus, “where ... there are two plausible constructions of a statute of limitations, we should adopt the construction that starts the time limit running when the cause of action ... accrues.” Id. When Congress intends to depart from this presumption, it does so “clearly.” Dodd v. United States, 545 U.S. 353, 360, 125 S.Ct. 2478, 162 L.Ed.2d 343 (2005) (interpreting AEDPA’s statute of limitations).
Here, the cause of action is created not by the MLA itself, but by the APA. A cause of action accrues under the APA upon the occurrence of a “final agency action.” 5 U.S.C. § 704. Therefore, we start with the presumption that the MLA’s statute of limitations begins to run at the time of the “final agency action” in question. But, as Judge Lucero’s concurrence points out, the MLA uses the phrase “final decision of the Secretary” instead of “final agency action” to describe the point at which the limitations period begins to run. The question, then, is whether this difference in wording should be interpreted to alter the presumption.
As Judge Lucero’s concurrence rightly notes, this principle of construction is intended only to “resolve ... ambiguity, not to create it in the first instance.” Graham Cnty., 545 U.S. at 418, 125 S.Ct. 2444. But as I explain further below, I conclude that the word “final” carries an unambiguous and determinative meaning found in several of our precedents, and thus the presumption is not strictly necessary to my analysis. I nonetheless raise it to emphasize that insofar as one believes there is any ambiguity in the meaning of “final decision of the Secretary,” that ambiguity should be resolved in favor of the affected parties.
While Judge Lucero’s concurrence likewise finds “final decision of the Secretary” to be unambiguous, it, too, invokes a principle of construction — the general proposition that “a waiver of the [g]overnment’s sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign.” Iowa Tribe of Kan. & Neb. v. Salazar, 607 F.3d 1225, 1236 (10th Cir. 2010). But the Supreme Court has applied *1261 the presumption that a statute of limitations runs from the time the cause of action accrues in the context of a section 1983 suit, see Wallace v. Kato, 549 U.S. 384, 388, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007), despite the fact that a Congressional abrogation of state sovereign immunity, like a waiver of federal immunity, is strictly construed, see Will v. Mich. Dep’t of State Police, 491 U.S. 58, 65, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). The Court has also relied on this presumption in the federal habeas context. See Johnson v. United States, 544 U.S. 295, 305, 125 S.Ct. 1571, 161 L.Ed.2d 542 (2005) (citing Bay Area Laundry, 522 U.S. at 195, 118 S.Ct. 542). Our own court, too, has applied this presumption against the federal government. See United States v. Rodriguez-Aguirre, 264 F.3d 1195, 1210 (10th Cir. 2001).
In light of these precedents, I see no reason not to adhere to the standard presumption that statutes of limitations should be interpreted to run from the time the cause of action accrues.[1]

B. Finality

Judge Lucero’s concurrence goes on to posit that a “final decision of the Secretary” occurs whenever the Secretary has made up his mind. Thus, the February 6 memorandum must be the Secretary’s final decision because, “the Secretary completed his deliberative process on February 6. He had literally no further involvement in this matter after that date.” Lucero Concurrence at 1252. The problem with this interpretation is that it gives short shrift to the word “final,” and is sharply at odds with the way we have interpreted that word in the past.
In the context of judicial review of administrative action, “final” carries a specific meaning demarcating the point at which the agency (or secretarial) decision-making process ends and the potential for judicial oversight begins. Although courts have not had occasion to examine the meaning of “final” in the MLA context specifically, they have done so extensively with regard to the APA.
Under the APA, two conditions must be met for an agency action to be final: the action (1) must be a “consummation” of the decision-making process, and (2) “must be one by which ‘rights or obligations have been determined,’ or from which ‘legal consequences will flow.’ ” Bennett v. Spear, 520 U.S. 154 at 177-78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (citations omitted). We have said, “[i]f an agency has issued a ‘definitive statement of its position, determining the rights and obligations of the parties,’ the agency’s action is final ... so long as ‘judicial review at the time [would not] disrupt the administrative process.’ ” Ctr. for Native Ecosystems v. Cables, 509 F.3d 1310, 1329 (10th Cir.2007) (quoting Bell v. New Jersey, 461 U.S. 773, 779-80, 103 S.Ct. 2187, 76 L.Ed.2d 312 (1983)). A decision is consummated when it is “definitive, immediately effective, and directly and immediately affect[s] petitioners’ daily business activities.” Id. (citing Abbott Labs. v. Gardner, 387 U.S. 136, 151-53, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)).
There is no reason to believe that Congress intended “final” as used in the MLA *1262 to have an altogether different meaning than in the APA. That the word modifies “decision of the Secretary” instead of “agency action” does not suggest otherwise. As the Supreme Court observed in finding that “final” meant the same thing in the APA as it did in the Clean Air Act:
The bite in the phrase “final action” ... is not in the word “action,” which is meant to cover comprehensively every manner in which an agency may exercise its power. It is rather in the word “final,” which requires that the action under review mark the consummation of the agency’s decisionmaking process. Only if the [agency] has rendered its last word on the matter in question is its action “final” and thus reviewable.
Whitman v. Am. Trucking Ass’n, 531 U.S. 457, 478, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001) (citations and quotation marks omitted).
Other courts have applied the APA definition of “final” to other statutes using that word in the context of judicial review. See, e.g., In re Aiken County, 645 F.3d 428, 437 (D.C.Cir.2011) (applying the Bennett framework to “final decision or action of the Secretary” under the Nuclear Waste Policy Act); Pub. Util. Dist. No. 1 of Snohomish Cnty. v. Bonneville Power Admin., 506 F.3d 1145, 1151-52 (9th Cir. 2007) (“The [Northwest Power] Act does not specify what constitutes a ‘final’ agency action, so we have looked to the ‘more general doctrine of finality in administrative agency law.’ ” (quoting Puget Sound Energy, Inc. v. United States, 310 F.3d 613, 624 (9th Cir.2002))).
The Court of Appeals for the D.C. Circuit was confronted with an issue strikingly similar to the one we face here in John Doe, Inc. v. DEA 484 F.3d 561, 566 (D.C.Cir.2007). The court analyzed whether a decision of the Attorney General was “final” for the purposes of the Controlled Substances Act, which stated “any person aggrieved by a final decision of the Attorney General may obtain review of the decision in the [D.C. Circuit].” 21 U.S.C. § 877. The court, deciding the Bennett finality framework applied, explicitly acknowledged the difference in wording between the Controlled Substances Act and the APA, but “s[aw] no reason ... that the word ‘final’ in § 877 should be interpreted differently than the word ‘final’ in the APA.” John Doe, Inc., 484 F.3d at 566.
Likewise, I see no reason to interpret the word “final” in the MLA differently from the word “final” in the APA. Although I agree with Judge Lucero’s concurrence that a “decision of the Secretary” may be metaphysically distinct from an “agency action,” I do not think the distinction makes any practical difference here— for the same standards of finality apply to both.
Judge Lucero’s concurrence points to Dodd v. United States, 545 U.S. 353, 125 S.Ct. 2478, 162 L.Ed.2d 343 (2005), but it is not to the contrary. Dodd examined the statute of limitations in the Anti-Terrorism and Effective Death Penalty Act (AEDPA), which runs from “the latest” of a number of enumerated events — none of which involve agency action or secretarial decisionmaking. See 28 U.S.C. § 2255(f). The particular provision at issue in Dodd applied a one-year statute of limitation from “the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review.” § 2255(f)(3). The question was when the limitations period began to run where the Supreme Court recognized a right in one case, and made that same right retroactively applicable in a different case more than one year later. See Dodd, 545 U.S. at 355,125 S.Ct. 2478. The Court ruled that the limitations period began to *1263 run on the earlier date, when the right was “initially recognized,” even though it had not yet been made retroactive. Id. at 857, 125 S.Ct. 2478. The Court “recognize[d] the potential for harsh results,” but found that its disposition was “required by the text.” Id. at 359,125 S.Ct. 2478.
Dodd is certainly relevant for the proposition that where the meaning of a statute of limitations is unambiguous, we must obey the text even when doing so results in the limitations period starting — or expiring — before the cause of action accrues. But Dodd has nothing at all to say about the meaning of “final decision of the Secretary.” Judge Lucero’s concurrence jumps to the conclusion that “final decision of the Secretary” occurs at the point when “the Secretary has completed his decision-making process” — as though this interpretation were obvious. Lucero Concurrence at 1251. But the fact that one may, at first glance, find the phrase unambiguous does not mean one should ignore other courts’ interpretations of very similar statutory phrases. Cf. I.C.C. v. Bhd. of Locomotive Eng’rs, 482 U.S. 270, 284-85, 107 S.Ct. 2360, 96 L.Ed.2d 222 (1987) (interpreting a statutory provision with reference to past interpretations of a similar provision in another statute); Hobbs ex rel. Hobbs v. Zenderman, 579 F.3d 1171, 1181-82 (10th Cir.2009) (same). At a minimum, those courts’ interpretations should cause one to question whether the meaning is really so clear. See United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah, 472 F.3d 702, 710 (10th Cir.2006) (“A statute is ambiguous when it is capable of being understood by reasonably well-informed persons in two or more different senses.” (citation omitted)); see also Hackwell v. United States, 491 F.3d 1229, 1235 (10th Cir.2007) (“[A] dictionary definition, standing alone, is not necessarily dispositive.”). And, as previously noted, to the extent one finds the wording ambiguous (though I do not), one should follow the presumption that the limitations period runs from the time the cause of action accrues.
Thus, to start the running of the limitations period, a “final decision of the Secretary” must bear the hallmarks of finality described in Bennett: consummation and legally-binding effect on the affected party.

C. Accrual

The parties have proposed three different dates on which the “final decision of the Secretary” could have occurred. First, February 4, the date of Secretary Salazar’s press conference. Second, February 6, the date of Secretary Salazar’s intraagency memorandum to the BLM’s Utah State Director. Third, February 12, the date of BLM’s letters to the plaintiffs notifying them of the Secretary’s decision and authorizing a refund.
Only the February 12 date comports with the finality principles discussed above.

1. February b Press Conference

The government’s central contention to the district court was that a final decision was effected February 4, when Secretary Salazar held a press conference and issued a press release announcing his intent to retroactively withdraw plaintiffs’ leases. Although the majority does not go so far as to wholly embrace the press release as the date of the Secretary’s final decision, Judge Seymour’s concurrence relies in part on the press release in concluding that the final agency action occurred, at the latest, by February 6.
The notion that a press conference could constitute a formal agency decision — let alone a “final” one — is truly extraordinary. “No court has ever found a press release to be a final agency action under the APA.” Trudeau v. Fed. Trade Comm’n, 384 F.Supp.2d 281, 289 (D.D.C.2005). The *1264 only possible exception courts have ever considered (though never definitively ruled on) is that an agency press conference might constitute a final “sanction” under the APA insofar as it penalizes a party through adverse publicity. See id. (citing examples). While a press conference or press release may often accompany an important agency action, it is unheard of for an agency to claim that the press conference itself constitutes the legally operative, formal decision for purposes of judicial review.
The Department of the Interior’s own regulations give no support to the notion that, prior to this case, the Department ever claimed the power to rule by press conference. To the contrary, the regulations codifying the Secretary’s power to review his subordinates’ decisions explicitly require a “written decision.” 43 C.F.R. § 4.5(c) (“If the Secretary ... reviews a decision, the parties and the appropriate Departmental personnel will be advised in writing of such action, the administrative record will be requested, and, after the review process is completed, a written decision will be issued.”).
A press conference is fundamentally a political act, not a legal act; it serves to “express federal policy but lack[s] the force of law.” Barclays Bank PLC v. Franchise Tax Bd. of Cal., 512 U.S. 298, 329-30, 114 S.Ct. 2268, 129 L.Ed.2d 244 (1994); see also id. (“The Executive Branch actions — press releases, letters, and amicus briefs — ... are merely precatory.”). Whatever APA significance a press conference might have would be limited to the provision of notice to the public after an agency decision is consummated. A press conference is not a mechanism by which rights and obligations are determined, or from which immediate legal consequences flow. Thus, a press conference cannot be a final agency action.

2. February 6 Intrar-Agency Memorandum

The two concurrences find that a final agency action occurred no later than February 6, when the Secretary sent the intraagency memorandum to the BLM. According to the majority, the Secretary’s memorandum did not give the BLM any discretion in carrying out the Secretary’s will; thus, notifying the parties and refunding their money was simply a ministerial act.
The Secretary’s February 6 memorandum to the BLM stated, in relevant part:
There has been considerable controversy surrounding this lease sale ... On January 17, 2009, a Federal district court issued a Temporary Restraining Order enjoining issuance of oil and gas leases for 77 of the parcels offered. Given the concerns raised ... and my belief that the issues raised merit further review, I am directing you to withdraw the 77 parcels that were covered by the January 17, 2009, Temporary Restraining Order from further consideration in this lease sale.
In accordance with applicable laws, regulations, and agency procedures, please take all necessary actions to effectuate this withdrawal, including promptly notifying the high bidders and returning any monies received by the BLM in connection with these 77 parcels.
Aplt. Br. Add. at 23.
Some observations. First, the February 6 memorandum, though it does not vest the BLM with discretion regarding whether to withdraw the parcels, does not purport to “effectuate” the withdrawal of its own force; rather, it orders the BLM to “take all necessary actions to effectuate this withdrawal.” This wording suggests that on February 6 the parcels were not yet withdrawn. Second, the letter implies that to “effectuate” the withdrawal it is necessary for the BLM to take steps to *1265 notify the parties and refund their bids. Third, the letter contemplates compliance with “applicable laws, regulations, and agency procedures.”
As noted above, one of the applicable regulations here is 48 C.F.R. § 4.5(c), which states: “If the Secretary ... reviews a decision, the parties and the appropriate Departmental personnel will be advised in writing of such action, the administrative record will be requested, and, after the review process is completed, a written decision will be issued.” Although Judge Seymour’s concurrence finds the Secretary satisfied the “issued” requirement by issuing a memorandum to a subordinate, the fact that the regulation requires notice to be given to both “Department personnel” and “the parties” suggests that the “written decision” must be “issued” to the affected parties as well.[2] The D.C. Circuit, addressing a similar problem, found that, for statute-of-limitations purposes, the word “issued” referred to the date when an order was published, rather than the date the agency claimed it was issued. See S. Pac. Pipe Lines Inc. v. U.S. Dep’t of Transp., 796 F.2d 539, 540 (D.C.Cir.1986). Arid our own court has approved the D.C. Circuit’s understanding. See Mesa Airlines v. United States, 951 F.2d 1186, 1188 (10th Cir.1991).
Judge Seymour’s concurrence characterizes the agency’s action as mere “sloppiness.” Seymour Concurrence at 1257-58. Be that as it may, sloppiness can and does have legal consequences. The fact that the BLM did not issue an order to the parties until February 12 — and even then, did not notify them of the February 6 memo — is “behavior” inconsistent with a February 6 date of finality. Whitman, 531 U.S. at 479, 121 S.Ct. 903.
The Secretary’s course of action — internally directing the BLM to effectuate the withdrawal, as opposed to declaring the parcels withdrawn — is consistent with the way the Department’s regulations internally allocate authority. Under Department regulations, “[a]U of the Department of the Interior’s non-royalty responsibilities related to the approval and supervision of operations on onshore Federal ... oil and gas leases have been consolidated within the Bureau of Land Management.” 48 Fed.Reg. 36582-02, 36582. Thus, in practice, most “decision[s] of the Secretary” under the MLA are in fact decisions by BLM administrators exercising authority delegated to them pursuant to these regulations.
While the intra-agency memorandum may have been binding in the sense that it obligated the BLM to act, it was not legally binding with regard to external parties. One reality of the modern federal administrative state is that cabinet department heads act through a web of subordinates, and their actions are not effectuated legally until they are carried out by those subordinates. Another reality is that the President and Congress have much to say about agency action and may intervene before a decision is finalized.
Thus, for example, in Justheim Petroleum Co. v. Department of Interior, 769 F.2d 668 (10th Cir.1985), we found that even though the Secretary had directed the BLM to issue certain oil and gas leases to an applicant, that issuance was not legally effective where Congress withdrew the Secretary’s authority to issue the lease “[bjefore the BLM acted on [plaintiffs] applications.” Id. at 671. In other words, the Secretary’s command, though final in the sense that the Secretary had made up *1266 his mind, was not legally final until executed by the agency.
The structure of the administrative state necessitates that internal agency communications have no external legal effect until they are externally manifested — that is, until they are “issued.” Ctr. for Native Ecosystems, 509 F.3d at 1329. This is why, in Mesa Airlines, we recognized that “[a] decision becomes a final decision when it is both complete and passes out of the control of the authority by being released to the interested parties or to the public in decisional form.” Mesa Airlines, 951 F.2d at 1188 (emphasis added). Here, although the Secretary sent a memorandum to a subordinate, that decision did not “pass[] out of [his] control ... by being released to the interested parties” until the BLM mailed the February 12 letters. Id. Unlike Judge Lucero, I am not hard-pressed to interpret the phrase “final decision of the Secretary” to require a “transmittal of the Secretary’s directive,” for it is the act of external transmission, whether performed by a subordinate or by the Secretary himself, that consummates the decision and gives it a binding legal effect on the affected parties. Lucero Concurrence at 1250-51.
Several counterfactuals clarify this point. Suppose that on February 11, before the letters were mailed, the Secretary had changed his mind and reversed the withdrawals before they had ever been effectuated by the BLM. Surely stakeholders could not then challenge this change on the grounds that the February 6 memorandum was a legally-enforceable agency action. So holding would prevent a cabinet official from ever altering a directive without exposing himself to an APA suit by an aggrieved party or interest group.
Alternatively, suppose that on February 7 the memorandum was leaked to the successful bidders. Under Judge Lucero’s approach, they could not immediately bring suit against the Department of the Interior to demand a refund, because the Department had not, at that point in time, “issued a ‘definitive statement of its position, determining the rights and obligations of the parties.’ ” Ctr. for Native Ecosystems, 509 F.3d at 1329.
Or suppose the Secretary told his chief of staff on February 1 that he had decided to withdraw the leases. Isn’t that decision as “final” as the February 6 memorandum? After all, both merely communicate the Secretary’s decision to a subordinate and might be the Secretary’s last personal involvement in the decision. Under Judge Lucero’s logic, this conversation would trigger the limitations period.
Our precedents also suggest that in considering whether an agency action is final, we should consider the effect our decision would have on the orderly conduct of the administrative process. See Ctr. for Native Ecosystems, 509 F.3d at 1329 (“[T]he agency’s action is final ... so long as ‘judicial review at the time [would not] disrupt the administrative process.’ ”); see also Barrick Goldstrike Mines Inc. v. Browner, 215 F.3d 45, 49 (D.C.Cir.2000) (issuance of an enforcement letter “erystallize[s] an agency position into final agency action within APA § 704’s meaning”). Judge Lucero’s interpretation of “final decision” — whenever the Secretary “ha[s] literally no further involvement in [the] matter,” Lucero Concurrence at 1251 — would necessitate judicial intrusion into the decision-making processes of the executive branch, as parties fight over which memorandum (or press conference) constituted the “final” agency decision. Cf. Trentadue v. Integrity Comm., 501 F.3d 1215, 1226 (10th Cir.2007) (“[0]fficials will not communicate candidly among themselves if each remark is a potential item of discovery.” (quoting Dep’t of Interior v. Klamath *1267 Water Users Protective Ass’n, 532 U.S. 1, 8, 121 S.Ct. 1060, 149 L.Ed.2d 87 (2001))).
Judge Seymour’s approach will lead to similar problems. Judge Seymour refuses to decide whether the press release or the memorandum constituted the final agency action, instead concluding that the decision was final “by February 6.” Seymour Concurrence at 1255-56. Her analysis, in essence, combines various aspects of these documents that, in her view, collectively satisfy the Bennett factors. But if the press conference alone was insufficient, and the memorandum was not disclosed, the result is the same as under Judge Lucero’s analysis: the affected parties will have no idea when their cause of action accrues.
The per curiam opinion’s holding carries at least two significant future implications.
First, giving legal effect to internal agency documents will likely expose agencies to judicial challenges that would today be considered unripe. “[T]he purpose of the ripeness doctrine is: ‘to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.’ ” Sierra Club v. Yeutter, 911 F.2d 1405, 1415 (10th Cir. 1990) (emphasis added) (quoting Abbott Labs., 387 U.S. at 148-49, 87 S.Ct. 1507). One of the key factors of a ripeness inquiry is “whether judicial intervention would inappropriately interfere with further administrative action.” Signature Props. Int’l Ltd. P’ship v. City of Edmond, 310 F.3d 1258, 1265 (10th Cir.2002) (quoting Roe No. 2 v. Ogden, 253 F.3d 1225, 1231 (10th Cir.2001)). Thus, when there is a possibility (even a remote possibility) of an agency modifying a decision before it is formalized and issued, we have found the agency’s decisionmaking processes protected by the ripeness doctrine. See Park Lake Res. Ltd. Liab. Co. v. U.S. Dep’t of Agric., 197 F.3d 448, 452 (10th Cir.1999). But after today’s ruling, the government will be hard-pressed to argue, as it typically does, that its internal decisions are not final in the judicially enforceable sense; stakeholders, quite rightly, will point to today’s decision as proof that press releases and internal directives are final decisions ripe for review, lest they inadvertently lose their window of opportunity to challenge the decision.
Second, the potential for agencies intentionally abusing the per curiam opinion’s holding — by keeping “final decisions” secret for some time, or by failing to disclose the precise dates such decisions were made internally — cannot be ignored. The notion that undisclosed — even secret — documents trigger a statute of limitations is contrary to the notion of open and accountable administrative decisionmaking.
Judge Seymour’s concurrence characterizes these consequences as a “parade of horribles.” Seymour Concurrence at 1257-58. But they are fully consistent with the approach taken by the majority; neither Judge Seymour’s concurrence nor Judge Lucero’s concurrence offer a limiting principle that would prevent these consequences, whether caused by sloppiness or intentional abuse.
Judge Lucero’s concurrence claims that the equitable tolling doctrine would be sufficient to curtail such abuses. But Judge Lucero also finds — quite rightly — that equitable tolling is meant to be an extraordinary remedy, and therefore is inapplicable here. The logical implication of the majority’s position is that the Secretary would have unlimited discretion to truncate the 90-day period specified by Congress to a length of his choosing, so long as he leaves some minimal window of time — a week? three days? — for an affected party to file a *1268 slapdash legal challenge. This discretion would not be limited to the MLA; rather, it would apply to every limitations period that Congress has seen fit to run from the time of a final decision rather than from the time notice is transmitted or received. Allowing agencies to alter limitations periods at their discretion would largely defeat the point of these statutes — to enable meaningful judicial review of agency decisions within a well-defined time period established by Congress.
Judge Lucero’s concurrence makes much of the fact that many statutes make the transmission of notice, rather than the receipt of notice, the point at which the limitations period begins to run, meaning that the time the notification spends in transit eats into the time the plaintiff has to challenge the decision. Judge Lucero reasons that because such schemes are unobjectionable, a scheme in which the limitations period is triggered by an undisclosed internal agency memorandum is likewise unobjectionable. Respectfully, I find the comparison unconvincing.
A transmission trigger serves the important goal of making statute-of-limitations disputes easy to resolve — a court need only look to a letter’s postmark or an email’s timestamp, rather than resolve a factual dispute regarding when the recipient actually received notice. A transmission trigger also makes it simple for the recipient to calculate the amount of time he has to challenge the decision. But a trigger based on an internal agency document muddles, rather than clarifies, the limitations period, particularly when it is not initially disclosed to the affected party. In addition, the necessary delay created by the postal service (or other delivery provider) is not subject to the same fairness concerns as a delay created by the agency itself, whether through deliberate withholding of notice or mere negligence.
In light of these considerations, I must conclude that the February 6 memorandum did not constitute a “final agency action” under the APA or a “final decision of the Secretary” under the MLA. Even if the Secretary’s decision was embodied in that memorandum, the decision was not final until it “passe[d] out of [his] control” by being externally manifested in some way. Mesa Airlines, 951 F.2d at 1188.

S. February 12 letter to the plaintiffs

Having excluded the February 4 press conference and the February 6 memorandum, we are left with the February 12 letter. This letter, unlike the press conference or the memorandum, satisfies the finality standards described in our precedents. The letter, which was sent to the plaintiffs by certified mail, stated:
Dear [Plaintiff],
[Plaintiff] was the high bidder for oil and gas leases [lease numbers] at the competitive oil and gas sale held in this office on December 19, 2008.
The Secretary of the Interior, Ken Salazar has directed the BLM to withdraw these parcels from the December 19, 2008 Oil and Gas Lease Sale. Therefore, we are authorizing a refund in the amount of [amount paid] for the Bonus Bids, 1st Year’s Rentals and Administrative Fees.
Sincerely,
[signature]
Kent Hoffman
Deputy State Director
Division of Lands and Minerals
Aplt. Br. Add. at 24. The letter was dated February 12, 2009, and made no mention of the February 4 press conference or the February 6 memorandum.
The February 12 letter is a much better candidate for “final action” than either the February 4 press conference or the Feb *1269 ruary 6 memorandum. The letter “eon-summat[ed]” the agency action through an exercise of the Secretary’s delegated authority. Bennett, 520 U.S. at 177, 117 S.Ct. 1154. It constituted a formal issuance of a “definitive statement of’ the agency’s position. Ctr. for Native Ecosystems, 509 F.3d at 1329; see Mesa Airlines, 951 F.2d at 1188. And it “determined the rights and obligations of the parties,” id.— the plaintiffs lost all rights attached to their winning bids and became entitled to a refund in the amounts specified. Critically, judicial review after the February 12 letter was issued would not “disrupt the administrative process.” Id.
This contrasts with the February 6 memorandum, which, if it were the final decision, would have necessitated the plaintiffs undertaking intrusive inquiries into internal Interior Department communications in order to effectively vindicate their rights. It also satisfies the man-in-the-street common sense test we should always keep our eye on.
* * *
The majority’s decision today is a recipe for uncertainty, unfairness, and inefficiency in the administrative process. As one of our circuits facing a similar issue recently said:
If we considered agency statements lacking clear indicia of finality to nonetheless be final agency action, subjects of agency regulation would be forced to file repeated precautionary petitions for review. Such petitions would waste the time and resources of the Court and of the parties, and would promote unfairness by allowing an agency to retroactively determine whether a particular statement was final or not. Considerations such as these have long been an integral part of finality determinations.
Am. Airlines, Inc. v. Transp. Sec. Admin., 665 F.3d 170, 174 (D.C.Cir.2011). Such problems are amplified, of course, when the document at issue is an undisclosed memorandum. To the list above we may add intrusive disclosure requests of internal agency documents.
Surely Congress did not intend the result the per curiam opinion reaches today, and the text of the MLA does not command such an outcome — a result at odds with well-established principles of statutory construction, applicable case law, and an orderly process of judicial review of administrative action.

. Similarly, decisions of this court are "issued” when they are made public-not when the panel sends its final draft to the clerk of court.